UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No. 1:23-cv-08960** |
| Plaintiff, | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF** |
| v. | |
| VOYAGER DIGITAL, LLC, a limited liability company, VOYAGER DIGITAL HOLDINGS, INC., a corporation, and VOYAGER DIGITAL LTD., a foreign corporation; and | |
| STEPHEN EHRLICH, individually and as an officer of VOYAGER DIGITAL, LLC, VOYAGER DIGITAL HOLDINGS, INC., and VOYAGER DIGITAL LTD., | |
| Defendants, and | |
| FRANCINE EHRLICH, | |
| Relief Defendant. | |

Plaintiff, the Federal Trade Commission ("FTC"), pursuant to Sections 5(a), 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b) and 57b, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.*, which authorize Plaintiff to seek, and the Court to order, monetary relief, preliminary and permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the GLB Act. Defendants' violations are in connection with the marketing and sale of cryptocurrency custody and broker services.

1

**SUMMARY OF CASE**

1.      Voyager is a cryptocurrency company that markets and sells crypto-based financial services to consumers.

2.      From at least 2018 until the present, Defendants deceived consumers, many of whom were inexperienced with cryptocurrency, into transferring their fiat and cryptocurrency assets to the Voyager platform.  Defendants portrayed Voyager as a safe alternative to the traditional financial system and assured consumers that their funds were insured by the Federal Deposit Insurance Corporation ("FDIC").  In reality, Voyager was not an FDIC-insured institution, the FDIC does not insure crypto-assets, and even consumers who held cash with Voyager would not be eligible for FDIC insurance in the event that Voyager failed.

3.      On July 1, 2022, weeks after promising consumers that their "assets were safe and we're processing everything as normal," Defendants halted all withdrawals from and transfers on the platform, leaving millions of consumers without access to more than a billion dollars' worth of cryptocurrency and cash.

4.      On July 5, 2022, Voyager Digital, LLC, Voyager Digital Holdings, Inc., and Voyager Digital Ltd. declared bankruptcy.  Without FDIC insurance, consumers had no recourse to recoup their frozen assets.  Defendants prevented consumers from accessing cash deposits for over a month.  Consumers' crypto-assets were frozen indefinitely.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

2

6.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), (c)(3), (d) and 15 U.S.C. § 53(b).

## PLAINTIFF

7.     The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the GLB Act, which prohibits any person from using a false, fictitious, or fraudulent statement to obtain or attempt to obtain the customer information of a financial institution from a customer of a financial institution.

## DEFENDANTS

8.     Defendant Voyager Digital, LLC is a Delaware limited liability company with its principal place of business at 33 Irving Pl Fl 3, New York, NY 10003.  Voyager Digital transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Voyager Digital has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

9.     Defendant Voyager Digital Holdings, Inc. ("VDH") is a Delaware corporation with its principal place of business at 33 Irving Pl Fl 3, New York, NY 10003.  VDH transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, VDH has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

3

10.     Defendant Voyager Digital Ltd. ("VDL") is a Canadian limited company with its principal place of business at 333 Bay St, Ste 2400, Toronto, ON M5H 2T6.  VDL transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, VDL has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

11.     Defendant Stephen Ehrlich is a co-founder and CEO of Voyager.  He has been the Chief Executive Officer of Voyager Digital, LLC, Voyager Digital Holdings, Inc., and Voyager Digital Ltd since their inception.  Defendant Ehrlich has been involved in the day-to-day operations of the companies and has communicated with consumers about purported FDIC insurance coverage at Voyager.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Voyager Digital, LLC, Voyager Digital Holdings, Inc., and Voyager Digital Ltd, including the acts and practices set forth in this Complaint.  In connection with the matters alleged herein, Defendant Ehrlich transacts or has transacted business in this District and throughout the United States.

12.     Relief Defendant Francine Ehrlich is the spouse of Defendant Stephen Ehrlich. Defendant Stephen Ehrlich has transferred millions of dollars to Francine Ehrlich or to financial instruments benefiting Francine Ehrlich, including millions of dollars in proceeds from the sale of Voyager stock and the sale of a home sold at a discount to a trust in the name of Francine Ehrlich.  Relief Defendant Francine Ehrlich has received funds that can traced directly to Defendants' deceptive acts or practices alleged below, and she has no legitimate claim to those funds.

**COMMON ENTERPRISE**

13.     Defendants Voyager Digital, LLC, Voyager Digital Holdings, Inc., and Voyager

Digital Ltd. (collectively, "Corporate Defendants" or "Voyager") have operated as a common

enterprise while engaging in the deceptive acts and practices and other violations of law alleged

below.  Corporate Defendants have conducted the business practices described below through an

interrelated network of companies that have common ownership, officers, managers, business

functions, employees, and office locations, and that commingled funds and property, including

digital assets.  Because these Corporate Defendants have operated as a common enterprise, each

of them is liable for the acts and practices alleged below.

**COMMERCE**

14.     At all times relevant to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

**BACKGROUND ON CRYPTOCURRENCY**

15.     Cryptocurrencies are digital assets that exist on a technology called a blockchain,

a type of electronic ledger.

16.      There are thousands of different cryptocurrencies, sometimes called "coins" or

"tokens," in existence today.  Common cryptocurrencies include Bitcoin (BTC) and Ethereum

(ETH).  Most cryptocurrencies are not issued or created by any government or centralized

banking institution.

17.     Some cryptocurrencies are known as "stablecoins."  A "stablecoin" is a type of cryptocurrency that purports to be tied or "pegged" to another currency or financial instrument. For example, "USD Coin" attempts to peg its market value 1:1 to the U.S. dollar.

18.     Cryptocurrency companies have invested heavily in marketing in recent years. For example, one cryptocurrency exchange announced a $100 million advertising campaign in 2021, and another spent $20 million for an advertising spot in the 2022 U.S. Super Bowl. Cryptocurrency ads often feature popular celebrities and well-known athletes.  Voyager has followed this trend.  Since 2021, Voyager has featured a former NFL star in its ads and announced a partnership with the NBA's Dallas Mavericks.  Cryptocurrency's marketing efforts have been successful: Roughly three-quarters of those who have ever invested in, traded, or used cryptocurrency say they did so for the first time within the past five years.

19.     As consumer interest in cryptocurrency has risen, so have scams and frauds involving cryptocurrencies.  In 2022 alone, consumers reported over $1.4 billion in losses to cryptocurrency-related scams.  And 2022 saw the total collapse of certain cryptocurrencies, including so-called stablecoins, and popular cryptocurrency exchanges.

**DEFENDANTS' BUSINESS ACTIVITIES**

20.     Founded in 2018, Voyager is a publicly traded cryptocurrency financial services provider that markets a variety of cryptocurrency products and services to consumers throughout the United States.

21.     To sign up for an account and access Voyager's services, consumers must use Voyager's mobile application (the "Voyager App").  Once in the Voyager App, consumers must provide personal identifying information and link their bank account or off-site cryptocurrency

wallet to the platform to be able to purchase or transfer cryptocurrency.

22.     Voyager featured USD Coin prominently on its platform.  Voyager's services have included an Earn program that promises "rewards" (annual percentage yield or "APY") on deposits of cryptocurrency assets such as USD Coin; brokerage services that allow consumers to exchange, buy, or sell cryptocurrencies; and a debit card that allows consumers to make real-world purchases using USD Coin.

23.     Voyager maintained omnibus consumer depository accounts at Metropolitan Commercial Bank ("MCB") to store cash deposits from consumers.  MCB also served as the issuing bank for Voyager's debit card, which required consumers to have USD Coin in their account to fund purchases in dollars.

### Voyager's Deceptive Claims About FDIC Insurance

24.     Voyager advertised itself as a bank alternative for consumers to store their cryptocurrency and cash.  Defendant Ehrlich encouraged consumers to "ditch your bank" and use Voyager's debit card.  To bolster the impression that Voyager was a safe place for consumers to store their money, Voyager falsely represented that consumer deposits would be "FDIC insured." Many consumers decided to use Voyager based on the representation that the company and consumers' deposits were FDIC insured.

25.     Voyager made widespread marketing claims to encourage consumers to store their cryptocurrency, including USD Coin (the primary "stablecoin" on Voyager's platform), and cash with Voyager, and to convert cash to USD Coin to make purchases using Voyager's debit card.  In 2019, Voyager declared on its website—under a header stating in large, all caps font, "YOUR USD IS FDIC INSURED"—that "all customers' USD held with Voyager is now FDIC

insured." This meant, according to Voyager, that in the "rare event" of "the company or [its] banking partner's failure," consumers would be "guaranteed a full reimbursement (up to $250,000)," as depicted in the image below:



26. On November 12, 2020, Voyager tweeted that "USD held with Voyager is FDIC insured up to $250K" and directed consumers to "[s]tart growing your crypto portfolio today":



Have you heard? USD held with Voyager is FDIC insured up to $250K. Our customers' security is our top priority. Start growing your crypto portfolio today.

27.     Over the years, Voyager repeatedly misrepresented on its website and on its mobile app that consumers' funds were FDIC insured.  In a May 2022 blog post titled "Not all stablecoins are created equal," for example, Voyager encouraged consumers to add USD Coin to their portfolio to earn rewards, assuring consumers in bold and italic font that they could "[h]old and trade with confidence" since their USD balances were "FDIC insured up to of *[sic]* $250,000."

### Stability is just the beginning

The ultimate goal of crypto is financial equity and equal opportunity, and stablecoins are a major key to making this happen. It may seem like just a digital dollar, but big-picture, stablecoins are built to accomplish great things. Some are being used to help in economies crippled by inflation, or provide a new, accessible financial blueprint in developing countries. From borderless payments to cost-effective remittances, stablecoins are solving problems around the globe.

Head to the app to add USD Coin (USDC) to your portfolio and earn up to 9% annual rewards.*

***Hold and trade with confidence. Your US dollar balances are held by our banking partner, Metropolitan Commercial Bank, and are FDIC insured up to of $250,000. See more details here.***

*Note: Users must hold the minimum monthly average in USDC of $100 to earn rewards.*

28.     Defendants reinforced these FDIC representations in direct emails to consumers. Consumers report that one such email stated, "**What does it mean to be FDIC insured on Voyager?** Great question. Your US dollars held on Voyager are insured up to $250,000 by our banking partner, Metropolitan Commercial Bank, so your cash is safe with us."  Another email reassured consumers that "the cash you hold with Voyager is protected up to $250,000– which means it's as safe with us as at a bank."

29.     In fact, Voyager is not and has never been an FDIC-insured institution.  The FDIC

insures only deposits held by insured banks or savings associations.  Voyager is not a chartered

bank or savings association.  FDIC insurance does not extend to crypto-assets, such as the USD

Coin stored on Voyager's platform.  Nor did FDIC insurance protect consumers' U.S. dollar

deposits against Voyager's failure.

30.     FDIC insurance protects cash deposits only in the event of the insured

institution's failure.  Deposits held at MCB, an FDIC-insured bank, for example, were not

protected if Voyager failed.  Instead, MCB's FDIC insurance would enable Voyager to recover a

limited portion of its losses in the event of MCB's failure.

31.     Defendants were well aware that Voyager was not FDIC insured and that its

marketing could lead consumers to believe that Voyager was insured against losses of

cryptocurrency.  For example, in a November 2021 email exchange between Defendants and

Voyager's partner bank MCB, MCB asked Voyager to change how it described FDIC insurance

in the terms and conditions for Voyager's debit card, because MCB found the statement that

funds in the debit card account would be FDIC insured as "potentially misleading."  An MCB

representative went on to say that "a reasonable consumer could conclude that his USDC [USD

Coin] held with Voyager is FDIC-insured."  While Defendants modified the fine print in their

cardholder agreement, Defendants did not revise or take down the abovementioned FDIC

representations in consumer-facing marketing materials.

32.     On June 14, 2022, shortly before the company declared bankruptcy, Voyager

consumers received a letter from Defendant Ehrlich attempting to assuage any concerns about

the volatility of the crypto market and the failure of other prominent crypto firms.  In the letter,

Ehrlich stressed that, as a publicly traded company, Voyager goes the "extra mile to be

transparent about our balance sheet" and was "well-capitalized and positioned to weather the

bear market."  Ehrlich concluded the letter by reminding consumers that their Voyager deposits

were "FDIC insured" and "protected up to $250,000":

> This is also a good time to remind everyone that USD is held by our banking
> partner, Metropolitan Commercial Bank, which is FDIC insured. The cash you
> hold with Voyager is protected up to $250,000–which means it's as safe with us
> as at a bank.

33.     Then, a mere two weeks after Defendant Ehrlich reassured consumers in June

2022 that Voyager was "well-capitalized and positioned to weather the bear market," Defendants

unilaterally froze consumers' access to their deposits.

34.     Consumers were locked out of accounts that had been earmarked for down

payments for homes, college tuition for their children, and their life savings.  Many noted that

they put their savings into Voyager because they believed their deposits were FDIC insured.

35.     On July 5, 2022, Voyager filed for bankruptcy.  Cash deposits held on Voyager

with MCB were frozen for over a month.  All crypto-assets on the Voyager platform were frozen

indefinitely.

36.     In a letter to the bankruptcy court, one consumer said, "The money that my wife

and I were hoping to use for our young daughter's education in the future is now locked up."

37.     Another consumer recounted that his family had sold their condo and planned to

buy a home when they found out their newborn baby was diagnosed with Respiratory Syncytial

Virus and required a medical procedure.  As he put it, "We thought the USDC was FDIC insured

so we moved all the proceeds from the sale of our home to Voyager for [the] period we took off

the home search to care for our sick child.  It was always our plan to pull the money to purchase

a home . . ."

38.     In another letter to the bankruptcy court, a consumer lamented that he had put his life savings as well as a portion of his paycheck every month into Voyager for the last few years. As he put it, "I used Voyager to replace my savings account as it was advertised as FDIC insured, I am now filled with regret for doing so and fear that I pretty much lost everything for trusting this company."

39.     On July 28, 2022, the FDIC and Federal Reserve sent Defendants a letter telling them to cease and desist from making the following misrepresentations: (1) Voyager is insured by the FDIC; (2) consumers who invested with the Voyager cryptocurrency platform would receive FDIC insurance coverage for all deposits provided to, held by, on, or with Voyager, without reference to the insured depository institution account; or (3) the FDIC would insure consumers against the failure of Voyager itself.[1]

40.     Defendants continued to advertise that cash deposited with Voyager is "eligible for FDIC deposit insurance."  Not until freezing consumers' assets, declaring bankruptcy, and receiving a cease-and-desist letter from the FDIC did Defendants adjust its claims to specify that consumers' cash was not protected by FDIC insurance unless MCB—not Voyager—failed.

41.     To date, consumers have not been able to recover any loss of assets through Voyager's supposed FDIC insurance.

42.     Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants altered their claims about FDIC insurance only after they received a cease-and-desist letter from the FDIC and Federal Reserve.

---

[1] Joint Letter Regarding Potential Violations of Section 18(a)(4) of the Federal Deposit Insurance Act, https://www.fdic.gov/news/press-releases/2022/pr22056a.pdf.

## VIOLATIONS OF THE FTC ACT

43. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

44. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### Misrepresentations About FDIC Insurance

45. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of products and services offered through Voyager, including through the means described in Paragraphs 24 to 39 above, Defendants have represented, directly or indirectly, expressly or by implication, that consumers' deposits held with Defendants are FDIC insured.

46. The representation set forth in Paragraph 45 was false, misleading, or not substantiated at the time the representation was made.

47. Therefore, the making of the representation as set forth in Paragraph 45 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

48. Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

49.     The GLB Act defines "customer" to mean "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary."  15 U.S.C. § 6827(1).  The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer."  15 U.S.C. § 6827(2).

50.     Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

51.     Section 814(a) of the FDCPA, in turn, makes a violation of the FDCPA an unfair or deceptive act or practice in violation of the FTC Act.  15 U.S.C. § 1692l(a).  Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule.

52.     Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

53.     Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of

FTC trade regulation rules.  Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act.  This relief may include, and is not limited to, rescission or reformation of contracts, and the refund of money or return of property.

**Count II**

**Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customer Information of a Financial Institution**

54.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of products and services offered through Voyager, Defendants have made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution.  The customer information of a financial institution that Defendants obtain or attempt to obtain includes consumers' identity information, bank account numbers, routing numbers, and cryptocurrency wallet addresses.

55.     Defendants have obtained or attempted to obtain customer information of a financial institution by soliciting consumer deposits to the Voyager platform via representations to customers of financial institutions, directly or indirectly, expressly or by implication, that consumers' funds held with Defendants are FDIC insured.

56.     Defendants' representations set forth in Paragraphs 54 and 55 above were false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

57.     Therefore, Defendants' acts or practices set forth in Paragraphs 54 to 55 above violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**

**Francine Ehrlich (Relief Defendant)**

58.     Relief Defendant Francine Ehrlich has received, directly or indirectly, funds and/or other assets from Defendants that are traceable to funds obtained from Defendants' customers through the deceptive, unfair, and/or unlawful acts or practices described herein.

59.     Relief Defendant Francine Ehrlich provided no services in exchange for the assets received, she is not a bona fide purchaser with legal and equitable title to Defendants' customers' funds and/or other assets, and she will be unjustly enriched if she is not required to disgorge the funds or the value of the benefit she received as a result of Defendants' deceptive, unlawful, and/or unfair acts or practices.

60.     By reason of the foregoing, Relief Defendant Francine Ehrlich holds funds and assets in constructive trust for the benefit of Defendants' customers.

**CONSUMER INJURY**

61.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the GLB Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

62.     Wherefore, Plaintiff requests that this Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the GLB Act by Defendants;

16

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of consumer injury during the pendency of this action and to preserve the possibility

of effective final relief;

C.      Award monetary and other relief within the Court's power to grant; and

D.      Award any additional relief as the Court determines to be just and proper.


                                        Respectfully submitted,


Dated: October 12, 2023                 __/s/ Katherine M. Aizpuru_____
                                        QUINN MARTIN (*pro hac vice* to be filed)
                                        SANYA SHAHRASBI (*pro hac vice* to be
                                        filed)
                                        LARKIN TURNER (*pro hac vice* to be filed)
                                        KATHERINE M. AIZPURU (Bar No.
                                        5305990)
                                        Attorneys
                                        Federal Trade Commission
                                        600 Pennsylvania Ave., NW
                                        Mail Drop CC-10232
                                        Washington, DC 20580
                                        (202) 326-2080
                                        qmartin@ftc.gov, sshahrasbi@ftc.gov,
                                        lturner@ftc.gov, kaizpuru@ftc.gov

                                        *Attorneys for Plaintiff Federal Trade*
                                        *Commission*